UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

United States of America,

                Plaintiff,

v.

James Anthony Kroger,

                Defendant.

_____

No. 24-cr-85 (1) (DWF/DLM)

**ORDER ON MOTION FOR RELEASE FROM CUSTODY**

On May 20, 2024, Mr. Kroger filed a Motion for Release from Custody. (Doc. 46.) The government filed its response on May 28, 2024. (Doc. 51.) The Court held a hearing on Mr. Kroger's Motion for Release on June 27, 2024. (Doc. 77.) At the hearing, Mr. Kroger called psychologist Mary Kenning, Ph.D., to testify, and offered four exhibits (in addition to Dr. Kenning's report, which had been submitted earlier). (Docs. 47 (Dr. Kenning report), 74 through 74-4 (Defense Exhibits)). The government called no witnesses and offered no new exhibits, relying on its prior submissions in support of Mr. Kroger's detention.

Based on the parties' submissions and evidence, the Court concludes that Mr. Kroger has met his burden to identify information not known at the time of the initial detention hearing which has a material bearing on the Court's detention decision. *See* 18 U.S.C. § 3142(f)(2)(B). Therefore, Mr. Kroger's motion is granted to the extent he sought to reopen his detention hearing. But despite Mr. Kroger's presentation of new information, the Court still finds that Mr. Kroger should be detained based on the risk he poses to

community safety, which cannot be mitigated by any conditions short of detention. *See* 18 U.S.C. § 3142(e)(1).

## BACKGROUND

On April 2, 2024, Mr. Kroger was charged by indictment with nine counts of wire fraud in violation of 18 U.S.C. § 1343; three counts of money laundering, in violation of 18 U.S.C. §1 957; and one count of bankruptcy fraud, in violation of 18 U.S.C. § 157. (*See generally* Doc. 1.) After self-surrendering to law enforcement, Mr. Kroger made his initial appearance on April 5, 2024. (Docs. 7; 35 at 10.) The government moved to detain Mr. Kroger, and the Court ordered his preliminary detention pending a detention hearing which occurred on April 10, 2024. (Docs. 8, 21, 24.) Before Mr. Kroger's detention hearing, Pretrial Services submitted a Report and Addendum pursuant to 18 U.S.C. § 3154(1). (Docs. 69, 70.) In the Report, Mr. Kroger advised that he lived alone on his family's farm in St. Peter, Minnesota. (Doc. 69.) He also advised that he was diagnosed with Post-Traumatic Stress disorder and trauma. (*Id*.) The Report also included information about Mr. Kroger's criminal history and pending charges. (*See generally id*.) Pretrial Services initially recommended Mr. Kroger's release on conditions. (*Id.*) However, after reviewing the government's motion for detention filed on April 9, 2024, and Mr. Kroger's filings in opposition, Pretrial Services revised its position, and recommended that Mr. Kroger "be detained pending a mental health evaluation to determine potential risk of danger to the community and amenability to conditions of release." (Doc. 70 at 2.)

On April 10, 2024, the Honorable David T. Schultz held a detention hearing for Mr. Kroger. Both sides proffered evidence to the Court based on the Pretrial Services Report

2

and Addendum, and exhibits submitted by both parties. (Doc. 24.) In support of its motion for detention the government submitted documents entitled *The Kroger Report* and *The Kroger Report PART 2*, written by Mr. Kroger. (Docs. 9, 10.) The evidence presented to Magistrate Judge Schultz established that in response to the government's investigation into Mr. Kroger's alleged fraudulent conduct, Mr. Kroger sent both *Kroger Reports* to witnesses against him in this case, including the FBI case agent and attorneys for the Office of the United States Bankruptcy Trustee. (Doc. 24 ¶ 5.) Mr. Kroger also filed a criminal complaint with his local sheriff's office against individuals involved in the government's investigation, alleging misconduct. (*Id.*) The *Kroger Reports* contain intimidating and threatening language directed at specific individuals involved in some manner in Mr. Kroger's criminal case. (*Id.* ¶ 6.) Mr. Kroger states in *The Kroger Report PART 2* that he wishes for the United States Attorney to receive the death penalty and be executed by lethal injection. (*Id.* ¶ 7.) Mr. Kroger published this document via email to his targets the night before his initial appearance. (*Id.* ¶ 6.) The Court found that the language Mr. Kroger used in *The Kroger Report* and *The Kroger Report PART 2* is "both threatening and intimidating and could be considered to cross the line into direct threats toward these individuals." (*Id.* ¶ 7.)

Based on the evidence presented, Magistrate Judge Schultz detained Mr. Kroger, finding that no condition or combination of conditions could reasonably assure the community's safety. The Court noted that although Mr. Kroger has no criminal history, it had concerns about Mr. Kroger's impulsiveness and mental health given Mr. Kroger's conduct and the content of his writings. (*Id.* ¶ 10.) The Court also noted that the nature and

3

seriousness of the danger to any person or the community was strong explaining that the individuals involved in Mr. Kroger's case and/or named in *The Kroger Report* and *The Kroger Report PART 2* may feel not only a danger of physical harm, but also emotional harm as a result of Mr. Kroger's writings. (*Id.*) Finally, the Court found that Mr. Kroger's writings "present a danger to the dispensation of justice." (*Id.*)

Mr. Kroger timely appealed Magistrate Judge Schultz's Detention Order to the District Court. (Doc. 38.) Conducting a de novo review, Judge Donovan W. Frank overruled Mr. Kroger's objections to the Detention Order, and Mr. Kroger has since been detained in federal custody. (Doc. 53.) Mr. Kroger subsequently appealed Judge Frank's Order to the Eighth Circuit (Doc. 55), and that interlocutory appeal remains pending.[1]

Concurrent with its Detention Order, the Court ordered Mr. Kroger to undergo a mental health evaluation "by a competent mental health professional to advise the court of any further conditions that may be imposed to forestall additional similar conduct by Mr. Kroger[.]" (*Id.* ¶ 3.) On May 20, 2024, Mr. Kroger filed the instant motion, which seeks to reopen the detention hearing and have Mr. Kroger released from custody. (Doc. 46.) Mr. Kroger asserts that there is new information in the form of an evaluation from forensic psychologist Mary Kenning, Ph.D. (*found at* Doc. 47), and that Dr. Kenning's report "makes clear that Mr. Kroger's mental health conditions do not render him a danger to the community." (Doc. 46 at 1.) Mr. Kroger insists that based on this "material information

---

[1] Once Mr. Kroger filed his interlocutory appeal of the Court's Detention Order, the government asserted that the Court no longer had jurisdiction to consider Mr. Kroger's Motion for Release. (Doc. 61.) The Court disagrees. (Doc. 65.)

that was not known to the movant at the time of the [detention] hearing" the Court should "reopen his detention and order his release." (*Id.*)

The government, for its part, persists in opposing Mr. Kroger's release, asserting that the Court's prior decision was well-supported and that Mr. Kroger has failed to meet the burden for reopening a detention hearing. (Doc. 51.)

## ANALYSIS

Courts deciding whether to release or detain federal defendants do not have unbridled discretion. Rather, the Bail Reform Act, 18 U.S.C. § 3141 *et seq.*, provides considerable guidance and, in some circumstances, mandates. For cases like Mr. Kroger's—that is cases where the government has established "a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror"—the Court must hold a detention hearing where the government moves for one. 18 U.S.C. § 3142(f)(2)(B). At that hearing, the Court's task is to determine whether any "condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1).

> When making a detention determination under 18 U.SC. § 3142, courts consider: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to any person or to the community, and the risk of flight, which the defendant's release would pose.

*United States v. Graham*, 452 F. Supp. 3d 871, 877 (D. Minn. 2020) (citing 18 U.SC. § 3142(g)). As noted above, Mr. Kroger has already had a detention hearing, and does not

assert in this motion that it was procedurally unsound or substantively unfair. Rather, he seeks to reopen the issue of detention because of the new information regarding his mental health and his risk of danger to the community as outlined above. The new evidence offered by Mr. Kroger includes Dr. Kenning's report, Dr. Kenning's testimony at the Court's June 27, 2024 hearing, and four exhibits received from Mr. Kroger at the outset of that hearing.

To reopen a detention hearing, the information proffered must be more than just newly discovered; Mr. Kroger "must also show that this new information 'is material to and has a substantial bearing on whether the defendant should remain detained.'" *United States v. Hallmon*, No. 22-cr-365 (KMM/DTS), 2023 WL 3116747, at *3 (D. Minn. Apr. 27, 2023) (quoting *United States v. Thomas Petters*, No. 08-cr-364 (RHK/AJB), 2009 WL 205188, at *2 (D. Minn. Jan. 28, 2009); *see also United States v. Schaefer*, No 22-cr-283 (SRN/TNL), 2023 WL 111980, at *1 (D. Minn. Jan. 5, 2023). In other words, a defendant seeking to reopen must demonstrate how the new information "would reduce his risk of nonappearance or the risk that he poses to the community together with the remaining § 3142(g) factors." *United States v. Hall*, No. 19-cr-103 (MJD/ECW), 2020 WL 2992400, at *2 (D. Minn. June 4, 2020) (collecting cases).

The Court agrees with Mr. Kroger that the evidence he has offered is sufficient to reopen his detention hearing under 18 U.S.C. § 3142(f). The mental health evaluation, combined with Dr. Kenning's testimony, represents material information that was not known at the time of the detention hearing. This is because, as Dr. Kenning explained at the hearing, she has a particular expertise in forensic psychology and specialized training on assessing risk. Dr. Kenning employed these tools to render an opinion on Mr. Kroger's

6

risk to community safety, evaluating him through interviews and a review of relevant records (including the *Kroger Reports*). Thus, the Court grants Mr. Kroger's motion to reopen the detention hearing.

But reopening the detention hearing is only the first step. Having reopened the issue of Mr. Kroger's detention, the Court must next consider the factors outlined in 18 U.S.C. § 3142(g)—the nature and circumstances of the offense, the weight of the evidence against Mr. Kroger, Mr. Kroger's history and characteristics, and the nature and seriousness of the danger to any person or the community posed by Mr. Kroger's release—in light of this new information to determine whether any combination of conditions will mitigate the risk of Mr. Kroger's risk to community safety. *See* 18 U.S.C. § 3142(e)(1). Here, the government has sustained its burden to show by clear and convincing evidence that no combination of conditions short of detention exist.

As stated at the conclusion of the hearing, in ruling on Mr. Kroger's current Motion for Release, the Court fully endorses the conclusions of Judge Frank and Magistrate Judge Schultz as it relates to Mr. Kroger's apparent threat to community safety based on his conduct leading up to his initial appearance. To recap, Mr. Kroger produced a lengthy manifesto which he entitled *The Kroger Report*, which includes graphic and violent descriptions of different "punishments" that Mr. Kroger believes should be carried out on his enemies. (*See generally* Doc. 9.) But Mr. Kroger's targets are not abstract or amorphous; they include (by name) the United States Attorney, a Magistrate Judge, an FBI case agent, attorneys from the Office of the United States Bankruptcy Trustee, and another

7

likely witness in this criminal matter. (*Id.*) For each of these individuals, Mr. Kroger suggests that they will be subject to execution. (*Id.*)

Although Mr. Kroger has at times characterized himself as someone who was naively declaring what type of legal punishment is available toward those who break the law, that is simply unbelievable. Mr. Kroger is not a babe in the woods. He went to law school. He has two masters of law degrees. Even if he were correct that his rights have been violated, the notion that such conduct subjects people to execution is so obviously wrong that any person ought to know it. Mr. Kroger has responded that even if he were wrong about what legal consequences his supposed wrongdoers would face, his description of punishment was not *actually* threatening because never did he, personally, state he would be taking any action. His manifesto reflects just the opposite. Time and again, Mr. Kroger depicts his personal involvement in ensuring his brand of "justice" is carried out. (*See, e.g.*, Doc. 9 at 44 ("In attacking me, [the FBI] set in motion events they are powerless to stop), 115 ("I'm going to start by financially punishing you. If you don't learn, the punishment increases. . . . I don't stop and I don't go away."), 212 ("There's a reckoning coming . . . . I'll be seeing you."), 214 ("You started it, but by God I'm going to finish it."), 221 ("You do not walk away from this one."), 277 ("Don't test me or you're going to find out what it means to have the heard of a dragon."). And Mr. Kroger ensured that his targets would receive the document, because he sent it directly to them.

While the *Kroger Report* is troubling, more so is *The Kroger Report PART 2* (*found at* Doc. 10). As detailed in the Court's earlier Detention Orders, this document was sent by Mr. Kroger the night before his April 5, 2024 initial appearance (Mr. Kroger was to appear

8

by summons, so knew the date of his initial appearance). Here, Mr. Kroger calls for the public execution of the United States Attorney and excuses his "departure from the generosity and leniency" he exercised before as something necessary to "keep the federal government honest." (Doc. 10 at 8-9.) He again describes the punishment he seeks as an inevitability, because "[t]here is no pardon, only prison and at least 1 death sentence." (Doc. 10 at 10.) And again, although Mr. Kroger has at times suggested that his manifesto simply included observations about how legal punishment should be meted out, his words tell a different story: "A sacrifice must be made. The price must be paid. *I am Justice*." (Doc. 10 at 7 (emphasis added).)

Against this backdrop, Dr. Kenning evaluated Mr. Kroger's mental health. Most significantly, Dr. Kenning diagnosed Mr. Kroger with Delusional Disorder, Mixed Type (mixed because Mr. Kroger expressed both persecutory and grandiose delusions).[2] (Doc. 47 at 8.) She suggested that this disorder developed late in Mr. Kroger's adulthood, as there was no evidence of it prior to 2023. (*Id.*) Some manifestations of Mr. Kroger's delusions, according to Dr. Kenning, included his belief that the FBI wanted to kill him, as evidenced by several incidents in 2023. (Doc. 47 at 5.) These events included sending a fighter jet to follow Mr. Kroger, sending a helicopter to his family farm, and a bat bite, all of which he attributes to the FBI. (*Id.*) As of the time she drafted her May 20, 2024 report, Dr. Kenning noted that "Mr. Kroger continues to endorse focused grandiose and persecutory delusional

---

[2] During her testimony in support of Mr. Kroger's Motion for Release, Dr. Kenning stated that Mr. Kroger "has symptoms of both paranoid and grandiose delusional beliefs." (Tr. at 15.) It is unclear if Dr. Kenning was using persecutory delusions and paranoid delusions interchangeably, or simply misspoke.

9

beliefs. He has indicated his intent to prove their accuracy, although he maintained appropriate perspective about the difficulty that might accompany this endeavor." (Doc. 47 at 9.)

As a part of her report, Dr. Kenning also evaluated the risk Mr. Kroger may pose to community safety if he is released. In the section of Dr. Kenning's report entitled, "Risk Assessment," she explains that she used Mr. Kroger's records and interview to score his risk via the "HCR-20 Version 3." During her testimony, Dr. Kenning explained this is a 20-item checklist intended to measure a person's "history clinical risk" (thus the abbreviation HCR): "it looks at factors from a historical perspective, from a current perspective, and then from the future." (Tr.[3] at 13.) According to Dr. Kenning, the HCR-20 "is a very well-known measure that is used to assess the risk of *physical* violence or aggression." (Tr. at 13 (emphasis added).) Using this tool, Dr. Kenning assessed Mr. Kroger as a low-risk individual. (Doc. 47 at 7; *see also* Tr. at 13.) Consistent with that opinion, Dr. Kenning testified that she did not think Mr. Kroger's mental condition elevated his risk "in any way." (Tr. at 16.) When asked if she thought Mr. Kroger needed additional mental health treatment given her diagnoses, Dr. Kenning responded, "I think he should be evaluated again by his primary [care] provider. . . . He probably should—I think that any provider should be aware of his most recent diagnosis with delusional

---

[3]The official transcript of the hearing on Mr. Kroger's Motion for Release from Custody has not been published. When necessary, the Court cites the rough-draft, real-time translation of the proceedings provided by the Court Reporter.

disorder, whether it's through my report or something else, and potentially evaluated for his need for medication for that disorder." (Tr. at 23.)

During cross-examination, Dr. Kenning confirmed that she met with Mr. Kroger twice—once on April 17, 2024, and again on May 15, 2024. During this time, just weeks out from publishing *The Kroger Report PART 2*, Mr. Kroger's mental health remained untreated. The government also established that Mr. Kroger had previously been referred to psychotherapy by a neurologist but declined the treatment. Nonetheless, Dr. Kenning thought there was "some chance" Mr. Kroger might get mental health treatment if suggested by his primary care provider (Tr. at 37), even though Mr. Kroger denied that his thinking is delusional. Specifically related to any risk posed by Mr. Kroger, Dr. Kenning was presented with several snippets from Mr. Kroger's manifesto, including: a suggestion that it was "all over for" one person involved in his case, who may be executed (Tr. at 30); a statement that the United States Attorney would be executed because "I have warned you not to test my leniency" (Tr. at 30-31); the declaration that Mr. Kroger would "achieve justice and have my pound of flesh, have any personal revenge, I could easily see all five of these individuals imprisoned or lawfully executed" (Tr. at 31); and the eve-of-court statement that Mr. Kroger's "generosity and leniency" had been tested to the point that now "one should face the federal death penalty and be executed" (Tr. at 33). When asked if she viewed such comments as concerning, Dr. Kenning mostly dismissed them:

> It's hard to see some of that as threatening, right, because, again, it's talking about a legal process. It's not—the things that—and I see people make threats all the time, right? But the threats that I see that I am most alarmed by are the things like I am—I've been surveilling your house, I know where you go, I know where your children are in daycare, even those things are completely

11

> not true. Those kinds of personal threats I can really understand as being alarming. The things that are more have to do with the legal process and are clearly somebody who is mostly just overwrought about, you know, the possibility of some far off consequence, those I see as less alarming, I guess.

(Tr. at 34-35.) At bottom, Dr. Kenning's testimony reflected her professional opinion that Mr. Kroger was not threatening, that none of the above-cited comments were alarming, and that she mostly interpreted Mr. Kroger as yearning for the legal process to vindicate his rights. (Tr. at 29-35.) This was so, because in Dr. Kenning's career of conducting thousands of mental health evaluations, "I see this stuff all the time." (Tr. at 34.)

Dr. Kenning's assessment and testimony cannot carry the day for Mr. Kroger.[4] Among other things, Dr. Kenning did not address the entirety of the threat that Mr. Kroger poses to the community, despite that being a clear concern of the Court. (*See* Doc. 24 ¶ 11; Doc. 53 at 4-5.) The question is not simply whether there is a threat of physical violence. The Bail Reform Act's concern with community safety is not so myopic. *Accord* 18 U.S.C. § 3142(g)(4) (requiring consideration of the *nature* and *seriousness* of the danger posed by

---

[4] While Mr. Kroger submitted additional exhibits in support of his Motion for Release (Docs. 74 through 74-4), they are not persuasive in support of Mr. Kroger's position. If anything, one of them undermines his ability to comply with any court order: despite Mr. Kroger's assurances that he would no longer submit documents on his own behalf (*See, e.g.,* Doc. 47 at 9 ("[Mr. Kroger] has agreed that he will allow his attorneys to manage his legal matters in the future and will refrain from writing further documents on his own behalf."); Doc. 71 at 21 ("[Mr. Kroger is] completely willing to rely on counsel and not submit his own paperwork . . . .")), the very first exhibit he submitted at his Motion for Release hearing was a two-page document directly from Mr. Kroger (not his lawyer), that was specifically directed toward the undersigned. (Doc. 74-1.) The content of that document, particularly Mr. Kroger's concluding statement that there "never was any threat to anyone or anything," reflects a continuing failure of Mr. Kroger to accept the conclusions of several judges who have carefully reviewed his matter. But more to the point, the suggestion that Mr. Kroger could control his impulse to write about this matter was belied by very evidence he submitted in support of that position.

a defendant's release); *accord United States v. Busbin,* No. 3:23-cr-00182, 2024 WL 1313880, at *8 (M.D. Tenn. Mar. 27, 2024) ("Expressing disagreement with judicial opinions and the actions and perceived motives of judges and other public officials certainly is generally permissible. But launching a campaign of unfounded allegations tied to strong implications of threats to the personal safety of judges and other public officials is impermissible and generally very concerning."); *United States v. Kaetz*, No. 2:20-cr-1090-1, 2021 WL 37925, at *7 (D.N.J. Jan. 4, 2021) (finding defendant's statements that judge was a traitor, deserved the death penalty, and needed to be "dealt with" to be indicative of "significant" danger posed if defendant was released). Statements which would strike terror in any reasonable person who is their target represent a danger, even if not accompanied by physical violence. Yet the risk-assessment tool used by Dr. Kenning focused only on potential for *physical* violence. Thus, while her assessment represents some new material information on Mr. Kroger's likelihood of carrying out physically violent acts, it is incomplete in that it fails to assess his risk of continuing to do what he did up until the night before his first appearance in court: write and publish focused, graphic, violent suggestions that the United States Attorney, judges, FBI agents, and other people who he perceives as enemies be killed. These are properly viewed as threats, and they represent a continuing danger posed by Mr. Kroger's release—even if not acted upon. Particularly given the likely connection between these writings and Mr. Kroger's untreated

Delusional Disorder,[5] the Court is simply not convinced Mr. Kroger would not return such conduct upon his release, regardless of any Court Order to refrain from doing so.

## ORDER

For the reasons stated above, Mr. Kroger's Motion for Release from Custody (Doc. 46) is **GRANTED** to the extent that it sought to reopen the Court's detention hearing, and **DENIED** to the extent it sought Mr. Kroger's release.[6]

**SO ORDERED.**

Dated: July 2, 2024
           *s/Douglas L. Micko*
           DOUGLAS L. MICKO
           United States Magistrate Judge

---

[5] While Mr. Kroger's counsel persuasively suggested that Mr. Kroger's Delusional Disorder played a part in his inappropriate writings, (Tr. at 59), the Court notes that this condition remains untreated (and something that Mr. Kroger himself denies he has).

[6] Because Mr. Kroger's ultimate motion for relief is denied, no indicative ruling is necessary, even if this Court lacked jurisdiction by virtue of Mr. Kroger's interlocutory appeal. *See* Fed. R. Crim. P. 37(a)(2) & (b).